IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

DOROTHY MILLER,

      Plaintiff,

v.                         CASE NO. 1:16-cv-264-WTH-GRJ

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,[1]

      Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for a period of disability, Disability Insurance Benefits, and

Supplemental Security Income.  ECF No. 1.  The Commissioner has

answered, and both parties have filed briefs outlining their respective

positions.  ECF Nos. 9, 19, 20.  For the reasons discussed below, the

undersigned recommends that the Commissioner's decision be

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Accordingly, pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill should be substituted for former Acting Commissioner of Social Security, Carolyn W. Colvin, as Defendant in this matter. The Clerk is directed to correct the docket accordingly.

**AFFIRMED**.

# I.  PROCEDURAL HISTORY

Plaintiff applied for benefits on March 23, 2012, alleging disability beginning March 15, 2012.  R. 16, 284-91.  Her claim was denied initially and upon reconsideration.  R. 87-145.  At Plaintiff's request, a hearing and supplemental hearing were held before an Administrative Law Judge ("ALJ") on April 22, 2014, and October 20, 2014.  A vocational expert and a medical expert testified at the hearing.  R. 40-59, 60-87.  The ALJ issued an unfavorable decision on November 4, 2014, and the Appeals Council denied review.  R.  1-4, 16-26.

This appeal followed.  The sole issue presented is whether substantial evidence supports the ALJ's determination that Plaintiff could return to her past relevant work as a housekeeper when the medical expert conceded that personality disorders are not treatable and would result in absenteeism of three or more days per month.  ECF No. 19 at 28.

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[2]  Substantial evidence is more than a scintilla, i.e., the

---

[2] *See* 42 U.S.C. § 405(g) (2000).

evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[4] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[5]  However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner

---

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

properly applied the law.[6]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9] First, if a claimant is working at a substantial gainful activity, he is not disabled.[10]  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe

---

[6] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 20016 version unless otherwise specified.).

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

impairment and is not disabled.[11]  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[12]  Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[13]  Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[14]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[15]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[16]  The

---

[11] 20 C.F.R. § 404.1520(c).

[12] 20 C.F.R. § 404.1520(d).

[13] 20 C.F.R. § 404.1520(e).

[14] 20 C.F.R. § 404.1520(f).

[15] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F.
3d 1274, 1278 (11th Cir. 2001).

[16] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner.

Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[17]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[18]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[19]

---

The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[17] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[18] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[19] Walker, 826 F.2d at 1003.

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[20]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[21]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## III.  SUMMARY OF THE RECORD

### *A. Findings of the ALJ*

The ALJ determined that Plaintiff has the severe impairments of depression, anxiety, personality disorder, and hypertension, history of bipolar disorder with depression and a history of polysubstance abuse. Plaintiff does not have an impairment or combination of impairments that meets or equals the listings.  In assessing the severity of Plaintiff's mental impairments, the ALJ considered the "paragraph B" criteria and found that

---

[20] Wolfe, 86 F.3d at 1077-78.

[21] *See id.*

Plaintiff has mild restriction in activities of daily living, marked limitations in

social functioning, moderate difficulties in concentration, persistence, or

pace, and no episodes of decompensation.  The ALJ found that the

"paragraph C" criteria were not satisfied.  Based on the degree of limitation

found in the "paragraph B" mental function analysis, as supported by the

medical evidence and the testimony of the medical expert at the hearing,

the ALJ determined that Plaintiff has the RFC to perform light work, except

she is limited to no more than occasional contact with the public, co-

workers, and supervisors.  Relying on the testimony of a VE, the ALJ found

that a person with Plaintiff's age, education, work experience, and RFC,

would be able to return to her past relevant work as a

Cleaner/Housekeeper.  The ALJ therefore found that Plaintiff was not

disabled.  R. 18-25.

## B.  *Medical Evidence*

The ALJ noted that Plaintiff's file was significant for multiple

impairments including diagnoses of high blood pressure; depressive

disorder, recurrent with psychotic features; generalized anxiety disorder;

and personality disorder.  Because Plaintiff's issue on appeal concerns

only her mental impairments, the Court's summary of the evidence is limited to those records.

Plaintiff received treatment from primary care providers (PCP) at Helping Hands Clinic. Her treatment notes reflect that her provider prescribed various psychiatric medications, including antidepressants for depression and Invega for auditory hallucinations. R. 377-96.

In September 2012, Plaintiff reported that medication helped with voices, which had been reduced to "mumbling" once in a while. Her depression was better until she ran out of medication, and sleep was okay. R. 396. In October 2012, she felt depressed; the provider's assessment was that she was calm, cooperative, speech was appropriate, and thought processes were linear. Her insight and judgment were fair. She reported auditory hallucinations, and her Invega was increased. R. 395. It was increased again in November 2012 when she continued to report auditory hallucinations. R. 392. In March 2013, she was assessed with major depressive disorder, severe, recurrent. Her Invega was increased and she was switched from Lexapro to Celexa for depression. R. 387-88. At a follow-up appointment in June 2013, Plaintiff presented with an agitated

affect and was depressed.  She reported sleepwalking and hearing voices,
but she was off the Invega.  Her medications were continued.  R. 385.  In
May 2013, Plaintiff reported depression, insomnia, and auditory
hallucinations.  She reported that she did not realize her Invega dosage
had been increased and she had been taking a lower dose.  The physician
again increased her Invega dose to address the auditory hallucinations.  R.
384.

Treatment notes reflect that Plaintiff had no complaints other than
needing refills when she presented in October 2013.  R. 383.  In December
2013, it was noted that the "med helps her stay calm & pleasant."
Plaintiff's mental status examination was essentially normal, and she
reported no auditory hallucinations.  She reported that her two sons were
in prison.  Plaintiff was diagnosed with major depressive disorder,
recurrent, in partial remission.  R. 379.

A non-treating psychological consultant, Dr. Umesh Mhatre,
performed a consultative evaluation of Plaintiff in May 2014 and then
completed a mental status examination of Plaintiff.  R. 400-03.  As part of
her personal history, Plaintiff related that she last worked in 2011 and was

unable to work due to depression and being unable to get along with anyone. She worked in the housekeeping department at Holiday Inn for ten years, and lost her job when she did not show up for work. She reported arrests for fighting and possession of crack cocaine. She endorsed symptoms of low moods, crying spells, insomnia, and anhedonia. Plaintiff described getting up at 11:00 a.m. each day, eating breakfast and watching television, and then spending the afternoon cleaning the bedroom, vacuuming, washing clothes, and taking care of household chores. *Id*. at 401-02.

Dr. Mhatre's examination reflected that Plaintiff was depressed and cried during the interview. Her eye contact was good, cognition and comprehension were good, and there was no evidence of auditory or visual hallucinations, perceptual deficits, or psychosis. Plaintiff was oriented to time, place, and person, her speech was normal, and her social judgment was compromised. Plaintiff reported that her depression had recently gotten worse, with the primary reason being that her two sons were incarcerated. R. 402-03.

Dr. Mhatre assessed that Plaintiff had a "significant amount of

depression" which appeared to stem from concern for her children.  She did not have significant medical problems contributing to her depression. He assessed that she has an underlying personality disorder and that her "primary reason for not being able to work may very well have to do with her inability to get along with others which she candidly admits."  His diagnostic impressions were major depressive disorder, recurrent; personality disorder mixed with impulse control problems and antisocial traits; social stressors, including concern for her children; and a GAF of 60. Dr. Mhatre concluded that Plaintiff's primary reason for not working appeared to be her underlying personality disorder, and that her depression itself would not prevent her from working.  He assessed Plaintiff with "marked" limitations in her ability to interact appropriately with the public and with supervisors.  R. 403-05.

A non-examining State agency psychological consultant, Kevin Ragsdale, Ph.D., reviewed Plaintiff's file and concluded that she had mild limitations in activities of daily living, moderate limitations in social functioning, and moderate limitations in concentration, persistence, and pace.  R. 119-30.

## C. *Hearing Testimony*

Plaintiff was 53 years old at the time of the hearing.  She left school in the tenth or eleventh grade, and was in special education classes because of problems with reading and writing.  Plaintiff has a driver's license but does not drive due to pain in her spine.  She lives in a house with a roommate.  R. 44-46.

Plaintiff did housekeeping all of her life until 2011.  Plaintiff was tearful during the hearing, and stated that she gets depressed when she has to be in front of a lot of people.   When she worked as a housekeeper, she couldn't get along with people she worked with and would get angry at them for no reason and cry.  When she feels depressed, she stays in her room by herself.  During the day, she watches TV and cleans house until her back starts hurting.  She can cook a little and do laundry.   Plaintiff testified that her biggest problem was her back pain.  R. 46-52.

Regarding her mental impairments, Plaintiff testified that she hears voices about once a month or two times out of the month.  She testified that it happens when she is sleeping.  R. 52.

A medical expert and a VE both testified at the supplemental hearing.

Dr. Jonas, a licensed psychiatrist, testified that he had reviewed the medical evidence of record and that Plaintiff had diagnoses of depression and personality disorder.  He opined that the most significant work-related limitation appeared to be social, and that "we probably do not want to see this Claimant working in an unrestricted way with the broad general public." Dr. Jonas stated that Plaintiff's past work in housekeeping was performed essentially by herself, which would be appropriate.  Another limitation would be work that did not require more than a fairly simple or rudimentary intellectual capacity.  R. 62-64.

On cross-examination by Plaintiff's counsel, Dr. Jonas testified that Plaintiff had been treated for her reports of hallucinations with antipsychotic medication while her depression was treated with an antidepressant.  Dr. Jonas testified that based on his review of Plaintiff's treatment records, reported symptoms, and medication, there would be no symptomology that would cause functional impairments.  R. 69.

Regarding the diagnosis of personality disorder, Dr. Jonas testified that the diagnosis generally reflects at least one of three problem areas: self esteem, interpersonal ability, and affective control.  Although Dr.

Mhatre's[22] report reflects a diagnosis of personality disorder, Dr. Jonas testified that the report does not clearly reflect upon what the diagnosis is based.  R. 70.  In the same vein, while Dr. Mhatre diagnosed "personality disorder mixed with impulse control problems and antisocial traits," Dr. Jonas could not state upon what the "impulsive" finding was based.  He testified that "antisocial traits" is an ambiguous term that usually refers to someone who does not have respect for other people, rules, and society, and who behave in manipulative or uncivilized ways.  Dr. Jonas testified that "I don't see it anywhere in the case."  R. 71.

Dr. Jonas was questioned regarding Dr. Mhatre's conclusion that Plaintiff had a "marked" inability to interact appropriately with the public and with supervisors.  Dr. Jonas testified that he took into account the likelihood that Plaintiff would have difficulty interacting with other people, and could not conclude that a personality disorder was the cause of that limitation.  Rather, Dr. Jonas noted that Plaintiff's functioning had always been fairly low when it came to interactions with other people and yet she had consistently worked as a motel housekeeper.  Dr. Jonas opined that a

---

[22]The hearing transcript refers to "Dr. Montrey", but the references are to Exhibit 8F, Dr. Mhatre's report.

person who is depressed would not have an excellent capacity to deal with other people, and that there was no basis to assume that an underlying personality disorder caused Plaintiff's interpersonal problems. *Id*. at 72-73.

Plaintiff's counsel asked Dr. Jonas whether a patient complaining of three to six "bad days" per month could be the effect of a personality disorder and not depression. Dr. Jonas opined that a person who had a personality disorder with a degree of moodiness or general bad attitude, that was not separately diagnosable as depression but was "just part of the personality disorder," could experience that phenomenon. Dr. Jonas testified that personality disorders are "essentially untreatable except where individuals are motivated and insightful," and that the only treatment that makes a potential difference is psychotherapy, not medication. R. 75.

Plaintiff's counsel then asked whether a patient who had three to five bad days per month related to their personality disorder would have a solution with medication. Dr. Jonas reiterated that the disorder was not susceptible to treatment with medication, and is only partially susceptible to treatment with psychotherapy. He further testified that a personality disorder is "basically a fixed condition" as of the time a person turns about

18.  Therefore, one way to determine the functional impairment caused by a personality disorder is to see what level of functioning the person has had as an adult.  If a person had the functional capacity to perform housekeeping "more or less continuously from 1999 until 2011, with or without those three to six bad days a month . . . that's what their capacity is, and since personality disorder doesn't get better and it doesn't get worse, then that's what their capacity still is."  Dr. Jonas pointed out that according to Plaintiff's work history report, she worked continuously as a housekeeper with just one job change from 1999 until 2011.  *Id*. at 76-77.

The VE testified that a person with Plaintiff's age, education, work experience, and RFC for light work with only occasional contact with coworkers and supervisors could return to work as a housekeeper.   When Plaintiff's counsel included the limitation that the person would miss "three to five days of work randomly per month", the VE testified that the person would not be able to sustain any competitive work activity.  R. 78-81.

## IV. DISCUSSION

Plaintiff asserts that substantial evidence in this case supports a finding that Plaintiff cannot work, based on an analysis posited by Plaintiff

that assumes: (1) Plaintiff has a personality disorder; (2) Dr. Jonas conceded that personality disorders are not treatable; and (3) it is reasonable to expect that Plaintiff would miss three or more days per month as a result of her personality disorder, which would result in termination from employment.  ECF No. 19 at 28.

Relying on Dr. Jonas's opinion testimony, and the other medical evidence of record, the ALJ concluded that the RFC accommodated Plaintiff's functional limitations stemming from her mental disorders by limiting her to work that required no more than occasional contact with the public, co-workers, or supervisors.  R. 20.

The ALJ's determination in this case is supported by substantial evidence.  The problem with the analysis posited by Plaintiff is that it wholly overlooks Dr. Jonas' testimony that, based on his review of Plaintiff's treatment records, reported symptoms, and medication, there would be no symptomology that would cause functional impairments.  R. 69.  Dr. Jonas testified that he took into account the likelihood that Plaintiff would have difficulty interacting with other people, and could not conclude that a personality disorder was the cause of that limitation.  R. 72-73.

In fact, Dr. Jonas opined that the way to determine the functional

impairment caused by a personality disorder is to see what level of

functioning the person has had as an adult, since the condition becomes

relatively fixed around age 18.  Dr. Jonas explained that if a person had

demonstrated the functional capacity to perform housekeeping for a

lengthy, continuous period as an adult—as Plaintiff had—then their

functional capacity would remain the same because the condition does not

get better and does not get worse.   As Dr. Jonas pointed out in his hearing

testimony, Plaintiff worked continuously as a housekeeper with just one job

change from 1999 until 2011.  *Id*. at 76-77.

Although Dr. Jonas opined that a personality disorder was not the

cause of Plaintiff's functional limitations regarding social interaction, the

ALJ nevertheless identified it as a severe impairment.  The ALJ included a

limitation for Plaintiff's mental impairments in her RFC in view of Dr.

Mhatre's assessment that Plaintiff had moderate and marked limitations in

her ability to interact with the public, supervisors, and co-workers.  Plaintiff

points to no medical evidence in the record that supports a conclusion that

Plaintiff would miss three or more days per month as a result of functional

limitations stemming from her personality disorder, or that the ALJ's RFC would not account for the identified limitations.

In sum, on this record the Court finds that substantial evidence supports the ALJ's RFC determination regarding Plaintiff's functional mental limitations, that Plaintiff can return to her past work as a housekeeper, and that Plaintiff therefore is not disabled.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**DONE AND ORDERED** this 27th day of April 2017.

_s/ Gary R. Jones_
GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**